UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

MERLIN HILL,

     *Plaintiff,*     CASE NO: 13-CV-13097

*v.*           DISTRICT JUDGE THOMAS L. LUDINGTON
             MAGISTRATE JUDGE PATRICIA T. MORRIS

CAROL WALKER and
FERRY WALKER,

     *Defendants.*

_____/

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

### I. Introduction

  Plaintiff Merlin Hill brought this lawsuit in July 2013, alleging that his sister and her husband, Defendants, converted his property sometime in the late 1990s. (Docs. 1, 26.) Defendants have moved for summary judgment, contending that Plaintiff offers only hearsay and other inadmissible evidence to support his claim and, thus, he cannot raise a material factual dispute. (Doc. 53 at 455, 460.) The Court agrees and recommends GRANTING Defendants' motion.

### II. Background

  In 1997, Plaintiff was arrested for raping a minor and sentenced to life imprisonment the following year. (Doc. 53 at 458; Doc. 62 at 578); *see also Hill v. Mississippi*, No. 1:10-CV-22-SA-DAS, 2010 WL 3937967, at *1 (N.D. Miss. Sept. 10, 2010), *vacated on other grounds*, 459 F. App'x 365, 365 (5th Cir. 2012). His current claim stems from the fallout of his arrest, but his factual and legal arguments are often unclear. They are presented here largely as he made them,

without significant interpretation or reconstruction, because under any reasonable reading they fail to present a material factual issue.[1]

### a.    Plaintiff's Complaint

Plaintiff's complaint alleges that after his arrest Defendants entered his residence under false claims that Carol Walker was his legal guardian and "took possession of and removed to their residence [in Michigan] . . . all of [Plaintiff's] personal and business property/effects against [Plaintiff's] expressly stated wishes." (Doc. 26 at 97.) As proof that Ms. Walker lacked guardianship over him, he offers a heavily redacted letter from another sister, Christina, who asserted that lawyers told her that she could not help Plaintiff "as long as Carol is your overseer." (*Id.*, Ex. D at 104.) He also produces a letter from Ms. Walker, redacting all lines except for one that says she received his letters and another that states, "do what you want as for the guardian [sic] I dont [sic] care." (*Id.*, Ex. E at 107.)

The complaint then jumps to 2011, when Plaintiff claims to have written Defendants requesting pictures of his 1970 Datsun, which they had kept for him. (*Id.* at 97.) They refused his request and cut off communications, according to Plaintiff. (*Id.*) He then contacted Clara Hill, his mother, asking for pictures of his car; she allegedly responded by informing him that Carol Walker told her that the car had caught on fire while Defendant Ferry Walker was working on it. (*Id.* at 98.) The evidence for that assertion is another attached letter with heavy redactions. (*Id.*, Ex. F.) This one came from "Aunt Dee"; the unexcised portion begins by recommending that Plaintiff have Carol Walker take a picture of the car alongside a newspaper with the date visible. (*Id.*, Ex. F. at 110-11.) Next, Aunt Dee reported Ms. Walker's statement that "she [Ms. Walker]

---

[1] Though this section canvases Plaintiff's wide-ranging allegations and the proofs he offers to support his claim, the Court is aware that much of this evidence is inadmissible and thus irrelevant under the summary judgment standard. Indeed, Plaintiff's inability to provide relevant evidence is the very reason for recommending dismissal. Below, the Court addresses which evidence can be considered in determining whether a material dispute exists.

still has [Plaintiff's] belongings but plans on either giving it [sic] away . . . or throw it all [sic] away or have a bonfire." (*Id.*, Ex. F. at 113.) Aunt Dee also confirmed that Carol Walker told her about the car fire that occurred when Ferry Walker was making repairs that Plaintiff had requested. (*Id.*)

The story about the car fire sounds like so much nonsense to Plaintiff. (*Id.* at 98.) During his pre-arrest restoration of the car he had removed all flammable parts, so only a few items on the car could have been damaged "unless said fire came from the business end of an actelalene [sic] cutting tourch [sic]." (*Id.*) He soon heard from Denise Light that the story about the fire "was not entirely true"; but the new account Defendants were spinning sounded suspicious as well. (*Id.*) According to Ms. Light, Defendants now claimed that they had taken the car out of their pole barn and, while sitting outside, lightning struck it, setting it ablaze. (*Id.*) Hogwash, says Plaintiff: it is "nearly impossible" for cars to conduct lightning and, in any case, this car contained "nearly nothing flamible [sic]." (*Id.*) Shortly after relating this tale, Ms. Light sent another letter with yet another version of events. (*Id.*) Apparently Defendants had taken out insurance on the car, torched it, then collected the insurance money, "which they used for their own purposes." (*Id.*) As for his other property, they auctioned it and kept the proceeds "for their own use." (*Id.*) All that remained was his "250 plus year old violin, valued at $125,000." (*Id.*) Plaintiff provides none of Ms. Light's letters spelling out these hearsay statements.

In June 2011, Plaintiff received news of his violin. (*Id.*) Aunt Dee sent him a note—this one is attached as an exhibit—with dueling statements concerning the fate of his violin: "Carol [Walker] says she videotaped her burning it in her fireplace, telling Chrissy she could come get it from there. Chrissy says it wasn't burnt, Michael (Carol's son) and his wife have it. You decide?" (*Id.*, Ex. G at 117.) Around this time, Plaintiff instructed Defendants "to transfer

custodial control of all property belonging to [Plaintiff] to Christina Oakley, and specifically nam[ed] the violin and a deer mount (head) as part of the property to be transferred." (*Id.* at 99.)

The complaint then asserts that Plaintiff heard, from an unnamed source, that Ms. Walker was claiming that Plaintiff's estranged wife had taken many of his personal belongings in 1997, including the deer head mount. (*Id.*) This is another fabrication, Plaintiff gripes, adding that he has proof: he claims to possess "photographic evidence provided by Defendants in 2001" showing the deer head adorning their living room wall. (*Id.*) The photographs have not yet made an appearance in this case. Faced with more of the Defendants' stonewalling, Plaintiff asserts that he gave Christina Oakley "full written 'Power of Attorney,' with authorization to take immediate possession of, and remove to a secure location, all [of Plaintiff's] remaining business and personal property/effects." (*Id.*) Of course, "Defendants refused to comply." (*Id.*) And, of course, no documentary evidence of the power of attorney is provided.

The complaint also addresses, in a manner, the legal basis for Plaintiff's claim. It states that Defendants gained possession of his property "through fraudulent means (see Exhibit H) in violation of Miss. Code Ann. § 11-7-165." (*Id.*) That statutory section provides for increased damage awards to "vulnerable adult[s]" in civil cases against individuals who, among other things, convert the plaintiff's property or gain consensual possession of it "by intimidation, deception, undue influence or by misusing a position of trust or a confidential relationship with the owner." Miss. Code Ann. § 11-7-165(1). Plaintiff does not explain how Defendants accomplished this, instead merely pointing to Exhibit H, a 2011 letter from his former attorney. (*Id.*, Ex. H at 119.) In it, the attorney was apparently responding to Plaintiff's inquiry whether Carol Walker ever wielded a legal guardianship or conservatorship over Plaintiff after his arrest. The attorney could not recall any such device, but did remember "a Power of Attorney which

4

your sister may have had to conduct your personal affairs while you are incarcerated." (*Id.*) The attorney had prepared a "Durable Power of Attorney" for Plaintiff in June 1998, but did not have a signed copy. (*Id.*) Plaintiff's complaint adds that he has received psychiatric treatment for paranoid schizophrenia and depression since 2001. (*Id.*)

In addition to violating the Mississippi statute, Plaintiff contends Defendants "were, and continue to be, willful [sic] and maliciously reckless in their disregard of [his] rights," causing him mental anguish and emotional distress. (*Id.*) He cites a string of Mississippi Supreme Court opinions[2] dealing with punitive damages in either disability benefits or insurance cases. (*Id.*) He also defines "negligence"—without ever clearly alleging Defendants were negligent—and asks for damages pursuant to Miss. Code Ann. § 11-7-165 and $50,000 in punitive damages. (*Id.* at 99-100.) Finally, he asserts that Defendants forged his signature on a quitclaim deed, granting themselves his fifty-percent interest in real property located in Michigan. (*Id.* at 122.) He cites a Michigan criminal statute as legal grounds for his claim. (*Id.* (citing Mich. Comp. Laws §§ 750.248-750.249).)

The Complaint then offers three different exhibits listing the property Defendants filched or destroyed. (*Id.*, Exs. A-C at 101-03.) The first is entitled "Computer/Network Hardware" and lists nearly $50,000 in computer equipment, while the second describes "Computer/Network Software" of almost the same value. (*Id.*, Ex. A-B at 101-02.) The final list contains his personal

---

[2] *See Andrew Jackson Life Ins. Co. v. Williams*, 566 So.2d 1172, 1174 (Miss. 1990) ("The primary issue addressed in the case *sub judice* is whether the insurer . . . should be held accountable for its agents' allegedly 'unauthorized' misrepresentations of insurance policy provisions and conditions."); *Whittington v. Whittington*, 535 So.2d 573 (Miss. 1988) (concerning assignments and deeds to mineral rights and property), *overruled by C&C Trucking Co. v. Smith*, 612 So.2d 1092, 1105-06 (Miss. 1992) (overruling *Whttington* to the extent it held "that proof of net worth is prerequisite to an award of punitive damages"); *Life & Casualty Ins. Co of Tennessee v. Bristow*, 529 So.2d 620, 621 (Miss. 1988) ("This is an appeal from a jury verdict in the Circuit Court of Lee County in which Henry Edward Bristow was awarded . . . [compensatory and punitive] damages for his bad faith claim against Life & Casualty."); *Independent Life & Acc. Ins. Co. v. Peavy*, 528 So.2d 1112, 1113 (Miss. 1988) ("George R. Peavy filed suit . . . Against Independent Life & Accident Insurance Company, and against its agents . . . for tortious breach of contract, breach of fiduciary duties, and fraud in the inducement."); *Weems v. American Security Ins. Co.*, 486 So.2d 1222, 1224 (Miss. 1986) (addressing the plaintiff's "bad faith/punitive damages claim").

items: the Datsun and accompanying parts, the deer mount, and the antique violin.[3] (*Id.*, Ex. C at 103.) Elsewhere, he claims that Defendants converted roughly $15,000 of other property after his arrest, when Ms. Walker fraudulently claimed to be his legal guardian. (*Id.* at 122.)

        *b.*       *Defendants' Motion to Dismiss*

Defendants' motion to dismiss disputes many of Plaintiff's factual allegations. It states that after Plaintiff's arrest his family provided financial assistance. (Doc. 53 at 458.) For example, his mother co-signed for his attorney fees and, along with other family members, raised funds by selling some of his assets. (*Id.*) According to the mother's affidavit, they sold a lawn mower, Camaro, and motorcycle, among other items; Plaintiff's wife disposed of his horses and horse trailer. (Doc. 35 at 169-70.) Defendants argue that Plaintiff knew of the sale, attaching a letter from him to Carol Walker referencing a "garage sale" she conducted. (Doc. 53, Ex. A at 476.) The letter is undated.

In August 1998 Plaintiff granted Carol Walker a durable power of attorney, which Defendants attach to their motion. (*Id.* at 458.) The document bears Plaintiff's signature and is fully notarized. (*Id.*, Ex. C at 485.) Among other provisions, it gives Carol Walker full power over Plaintiff's real and personal property. (*Id.*, Ex. C at 480-81.) Plaintiff's attorney, referenced above, drafted the document. (*Id.* at 458.) To prove Plaintiff was aware of the power of attorney, Defendants offer another of his letters, again undated, which referenced Ms. Walker's new "rights" and  supposedly accompanied the signed power of attorney. (*Id.*, Ex. D at 487.)

Defendants argue that Plaintiff has offered only inadmissible hearsay to support his case, and thus his claim cannot survive summary judgment. (*Id.* at 460.) Specifically, the power of

---

[3] He says the violin is a "Joseph Steiner," crafted in the mid-1700s. He likely means it is a Jacob Stainer made in the mid-seventeenth century. *See* Joseph Pearce, *Violins and Violin Makers* (1866), *available at* http://www.gutenberg.org/files/37309/37309-h/37309-h.htm#steiner (last visited July 22, 2015); *Instrument Makers of the Stainer Family*, Encyclopedia Smithsonian, http://www.si.edu/encyclopedia_si/nmah/violstai.htm (last visited July 22, 2015).

attorney undercuts his case, which is premised "entirely on an allegation that Defendants took possession of his personal property under color of a non-existent 'Guardianship' and converted it for their own use or improperly disposed of same." (*Id.* at 462.) Defendants never used his property for their own purposes and all the actions they took were ratified by the power of attorney. (*Id.*)

The motion then addresses individual categories and items of property that Plaintiff alleges they converted. (*Id.* at 464-70.) Defendants deny ever possessing Plaintiff's computer equipment. (*Id.* at 464.) The sheriff's department seized the computers during Plaintiff's arrest and Defendants believe that his former attorney now has them. (*Id.*) They provide a letter from Plaintiff referencing the sheriff's seizure of these items. (*Id.*, Ex. G at 497.) Regarding the Datsun, Defendants claim that Plaintiff "instructed Ferry Walker to pour gasoline into the carburetor" to start the car; when he did, it caught fire. (*Id.* at 465.) They informed Plaintiff of this unfortunate turn and sold "what was left of the vehicle," using the proceeds "for the benefit of Plaintiff's children, as directed by Plaintiff." (*Id.*) Defendants have provided affidavits attesting to these events. (Doc. 37 at 174; Doc. 55 at 522-23.) Since these actions were pursuant to Carol Walker's power of attorney, they claim that they cannot be liable for conversion. (Doc. 53 at 465.)

Defendants admit that they had the violin, but claim that they gave it to Tina Lamoureaux, apparently another of Plaintiff's sisters, after Plaintiff indicated he wanted her to have it. (*Id.* at 466.) They attach a letter he wrote to Tina in 2011 as evidence. (*Id.*, Ex. H at 499.) The still have the deer head mount, but they no longer want to hold it for Plaintiff and have asked him to arrange for someone else to collect it, along with his other property. (*Id.*) They provide a

list of items they currently possess, which includes among other things books, pictures, records, a sword, and the deer head. (*Id.*, Ex. F at 494.)

Defendants never possessed Plaintiff's horses and, according to their affidavits, they believe his wife sold them before Defendants took possession of his property. (*Id.* at 467; Doc. 35 at 170; Doc. 55 at 523.) Nor are Defendants aware of Plaintiff's boat and boating equipment, which he claims they converted. (Doc. 53 at 467.) Plaintiff's mother has provided an affidavit admitting that she sold his Camaro, lawn mower, and motorcycle after his arrest. (*Id.* at 467-68; Doc. 35 at 169.) Finally, Defendants offer numerous real estate deeds showing history of the Michigan property that Plaintiff contends he owned. (Doc. 53, Exs. I-0.) Included among them is a quitclaim deed signed by Plaintiff and his wife in 1994, granting his interest in the property to Carol Walker. (*Id.*, Ex. N at 516.) The deed was signed by a Mississippi notary public, Hayden Ables, and was stamped electronically by the Oakland County record of deeds in Michigan. (*Id.*) Carol Walker's affidavit recounts the same information and states that Plaintiff knew he was signing over his interest in the property so that Carol Walker could sell it and deliver the proceeds to Archie Hill, Plaintiff's father. (Doc. 55 at 523-24.) She believes that Archie Hill paid Plaintiff a portion of the money he received. (*Id.*)

   c.   *Plaintiff's Response*

The gist of Plaintiff's response is that Defendants motion is dissembling at best and mendacious at worst. (Doc. 61.) First, he denies actually owning the Computer software listed in Exhibits A and B of his complaint; those items were the property of Merlin Internet Services, Inc., in which he served as president. (*Id.* at 574.) He promises to provide statements from fellow corporate officers, but has not yet done so. (*Id.*) The quitclaim deed signature cannot be his, he protests, because after a 1987 motorcycle accident his hands shake too much to write that neatly

8

and, in any case, "Plaintiff does not make 'D.' that way." (*Id.*) At times writing is nearly impossible, he claims, though all of his many submissions to the Court have been crisply penned by hand and legible. (*Id.* at 579.) Further, Defendants fail to disclose the unnamed "family members" who participated in the post-arrest garage sale. (*Id.* at 574.) "[A] simple check with Tishomingo Co. Sheriff David Smith and Deputy Dawson would identify those other family members as the Defendants themselves," Plaintiff concludes. (*Id.*) He has not, however, made that "simple check" yet. (*Id.*)

In his supporting brief, Plaintiff begins by denying that he ever asked Defendants to help him fund his legal defense. (Doc. 62 at 578, 580.) Why would he, since he had court-appointed counsel, he adds. (*Id.*) Carol Walker did later deposit money into his prison account, but those funds came from Archie Hill's Social Security disability checks. (*Id.*) And he did not receive a dime from the sale of the house. (*Id.* at 587.) "Defendants [sic] counsel is welcome to investigate [his] bank record [from the time of the sale,] but he will find no . . . deposit, or transfer to that account." (*Id.*) Further, the items Plaintiff's wife supposedly sold were actually returned to Plaintiff's residence by order of a federal judge in Mississippi. (*Id.* at 578.) Plaintiff does not provide the order, the case name, or any other information about the order. (*Id.*)

Plaintiff also discusses his history of mental health problems. (*Id.* at 578.) Prior to his sentencing in June 1998, he had spent three months in a "psychiatric exam" and was on numerous psychotropic medications. (*Id.*) As proof, he attaches a subpoena commanding a Dr. R. McMichael to appear before a Mississippi state court beginning in June 1998. (*Id.*, Ex. A at 591.) It says nothing about Plaintiff.

In an effort to obtain more time for evidence gathering, Plaintiff relates that his wife, "one of his primary witnesses," died recently, dealing his case a "severe blow." (*Id.* at 579.) He

notes, however, that there are other witnesses he hopes to contact, including his former counsel, a Mississippi deputy sheriff and the sheriff's husband, the county sheriff, and officers from his former corporation. (*Id.*) "And with the assistance of the Court," he plans to track down "Victoria Young Hill," apparently his daughter, to testify. (*Id.*)

The response seems to acknowledge that his legal claim is for conversion. (*Id.* at 580.) He states that Defendants removed his property from his home "more than 402 days prior to Plaintiff being forced, under duress, to sign the Durable Power of Attorney—of which [sic] Plaintiff DID NOT request to be drawn up, quite the [sic] contrary Plaintiff refused EVERY attempt to give up any of his Rights to anyone." (*Id.*) He explains that his counsel suggested the legal guardianship and that Carol Walker and Clara Hill concurred. (*Id.*) Plaintiff, however, disagreed with that suggestion and refused to grant anyone a power of attorney. (*Id.*) Yet "shortly after that meeting" Carol Walker "braged [sic] to everyone, including Plaintiff that she was Plaintiff's guardian." (*Id.*) According to Plaintiff, Victoria Young Hill—the same person Plaintiff needs help locating—will testify in support of this. (*Id.*)

When he learned that Carol Walker was not his guardian, he says he wrote Christina Oakley asking her to retrieve his property. (*Id.* at 580-81.) He included in that letter—which he does not provide—a power of attorney in favor of Ms. Oakley. (*Id.* at 581.) Though he does not give the dates of these letters, he elsewhere suggests that this occurred around 2011. (*Id.* at 583.) Defendants received a copy of that document, but still would not turn over the property. (*Id.* at 581.) Unfortunately for Plaintiff, Ms. Oakley's husband later prevented her from contacting Defendants, and Plaintiff's mother also was prevented by her boyfriend from assisting. (*Id.*) This, at least, was what he learned from an email his mother sent him in July 2011, which he attaches to the response. (*Id.*, Ex. C at 597.) To show that he demanded Carol Walker relinquish

10

her power of attorney, he produces the same redacted letter he attached to his complaint, which except for an irrelevant postscript reads in full: "Dear Dee, I have got all your letters . . . . [D]o what you want as for the guardian[sic] I dont [sic] care. But I will still be your sister." (*Id.*, Ex. E at 602-03.) And if this does not prove that the power of attorney has been rescinded, Defendants' letter to Plaintiff telling him they would not hold his property any longer shows they have terminated it. (*Id.* at 583; Doc. 59 at 546.)

Moreover, Plaintiff continues, Carol Walker's power of attorney is questionable. (*Id.* at 582.) First, "it was not executed before a notary public." (*Id.*) But a few lines later Plaintiff observes that it was notarized in August 1998. (*Id.*) This was not when he signed it, Plaintiff implies, though his explanation—involving his prison location, inmate number, and the date his attorney drafted the document—is difficult to follow, if not impenetrable. (*Id.* at 582-83.) In any case, when Plaintiff signed it he was in the prison psychiatric ward living under severe restrictions. (*Id.*) He left his cell once every three days for a shower, had no bed, no blankets, no privileges, and wore only a paper gown. (*Id.*) One day a nurse came in with the power of attorney and a letter from Carol Walker, which threated that if he did not sign the document she would force his daughter out on the street. (*Id.*) But he had, in open court, said that he wanted his daughters to live with his wife; Carol Walker was "one of the last people on Earth" he would want his daughters near. (*Id.*) Plaintiff provides no documentary or other support for this story, but he assures the Court it could all "be positively verified by [prison] records." (*Id.*)

Plaintiff also disputes that Defendants possess his—or rather, Merlin Internet's—computer equipment. (*Id.* at 581.) After a heated argument with Defendants, they took the property to Michigan and promised Plaintiff they videotaped the "disassembly and removal process so that Plaintiff would have no problem reassembling everyting [sic] later," after he

11

finished his life sentence. (*Id.*) Numerous individual can testify about this, including Clara Hill and Ms. Oakley—to prove they have such knowledge, he attaches a 2011 letter from Ms. Oakley stating that she, Clara Hill, and Carol Walker had been in Mississippi together. (*Id.*, Ex. D. at 599.) When, where, and why are unmentioned, and the letter never discusses the property removal. (*Id.*)

Plaintiff next addresses the individual items of property that Defendants allegedly swindled. He appears willing to concede that Defendants have turned *a* violin over to Tina Lamoureaux, but they have not proven to his satisfaction that the violin was his. (*Id.* at 583.) An email from his sister, Ms. Oakley, is adduced to support his statement that Defendants have refused his requests that they verify the identity of violin; the email simply states that Ms. Oakley does not think Carol Walker burned it. (*Id.*, Ex. H at 611.) Regarding the boat, Plaintiff states that the vice president of his old corporation will testify that it existed. (*Id.* at 584.) The argument about the Camaro and the lawn mower is crude and irrelevant, relying at base on his assertion that he "tend[s] to discredit anything Clara Hill says."[4] (*Id.*) His former counsel "should be able to testify that Defendant Carol Walker took charge of everything" at Plaintiff's "former house and corporate office." (*Id.*)

Finally, Plaintiff launches into a lengthy discussion of his interest in the Michigan real estate, which Defendants fraudulently obtained. (*Id.* at 585-87.) Most of it is not germane—for example, that his grandmother gave him the interest and "swore [him] to secrecy" that he was to

---

[4] He states:

> As for Plaintiff's Camaro [and lawn mower], As [sic] Defendants and Clara Hill came down to Mississippi, if not together, at the same time, [sic] I tend to discredit anything Clara Hill says after reading the lies and half-truths in her Affidavit, to find out how honest she is, [sic] ask if she ever had sex with Plaintiff when he was only 9yrs old or why she laid in bed all day smoking pot while her husband had sex with his preteen daughters, [sic] if she denies either disregard [sic] everything said by Clara Hill.

(*Id.*)

never sell it as long as his father lived there because she had concerns about Plaintiff's mother, or that "every person I've ever known can tell of the pride Plaintiff felt for that house." (*Id.* at 585.) His operative argument is that Defendants forged his signature on the quitclaim deed. (*Id.* at 586.) He has elsewhere provided copies of his true signature and affidavits from friends and a notary public opining that they do not resemble the signature on the quitclaim deed. (Doc. 66.) Moreover, he states that his signature is not witnessed. (Doc. 62 at 586.) What is the notary's signature doing on the page, then, if not witnessing Plaintiff's signature? Well, Plaintiff has had the "EMCF Law Librarian and Notary Public" investigate the notary, Hayden Ables, and they cannot even find that "a notary public in Tishomingo, MS. ever existed." (*Id.* at 586.) As for Mr. Ables, Plaintiff provides a list of current notaries public, and Mr. Ables is nowhere to be seen. (*Id.* at 586; *id.*, Ex. J at 615-17.) Of course, the deed was signed in 1994, twenty-one years ago. More proof could come from the hypothetical notary log book, which Plaintiff speculates might exist—he is no longer familiar with notary public law, he laments. (*Id.* at 586.) The log book, which had to be signed by people seeking notarized documents, from the date of the quitclaim deed would show he did not sign the document. (*Id.*)

   d.   *Defendants' Reply*

Defendants find Plaintiff's response to be too clever by half. If the computer equipment is not his, but rather a corporation's, than he is not the real party in interest and cannot bring a claim for conversion of the property. (Doc. 60 at 564.) The Mississippi Secretary of State's unofficial records show that the corporation, Merlin Internet Services, was formed in 1996, with Plaintiff named as the registered agent while two others are listed as incorporators, and that it dissolved in 1998. (*Id.*, Ex. A at 570.) Only the corporation or its successors in interest can litigate claims that Defendants converted its property.

Additionally, Defendants reiterate that Plaintiff has not met his burden of producing admissible evidence raising a material issue of fact. "Virtually every allegation is based on inadmissible hearsay," they contend." (*Id.* at 577.) He has not, for example, provided any proof that he rescinded his power of attorney. (*Id.*) Likewise, his requests for more time to locate witnesses should not be granted, as he filed the case in 2013 and has had two years to assemble sufficient evidence. (*Id.* at 567.)

e.    *Plaintiff's Sur-reply*

Without first seeking permission, Plaintiff filed an "Answer to Defendants' Reply to Plaintiff's Answer to Defendants' Motion," or a sur-reply. (Doc. 64.) The Local Court Rules do not provide for or permit sur-replies. *See McGee v. Schoolcraft Cmty. Coll.*, 167 F. App'x 429, 439 (6th Cir. 2006) ("However, this document was actually a sur-reply which was not permitted by the local rules. *See* E.D. Mich. L.R. 7.1"); *Washington v. City of Detroit*, No. 05-CV-72433, 2007 WL 1565351, at *3 (E.D. Mich. May 29, 2007) (noting that Local Rule 7.1 "does not expressly contemplate the filing of sur-replies"). Consequently, the Court could ignore the filing. *See Berry v. Main Street Bank*, 977 F. Supp. 766, 769 (E.D. Mich. 2013) ("Because this Court did not grant Plaintiff permission to file a sur-reply, the document filed . . . will not be considered by the Court."). However, given Plaintiff's *pro se* status the Court will consider the document. *Cf. Smith v. Federal Bureau of Alcohol, Tobacco, Firearms, and Explosives*, No. 13-13079, 2014 WL3565634, at *1 n.1 (E.D. Mich. July 18, 2014) ("[A]s Smith is representing himself *pro se*, and considering the document's brevity . . . the Court will consider his sur-reply.").

Plaintiff assures the Court that he is still rounding up evidence. He is "now in contact with Tishomingo County Chancery Clerk Peyton Cummings and attempting to find Mr. Hayden

Ables to verify whether or not Plaintiff signed the Quick-Claim-Deed [sic]." (Doc. 64 at 648.) Mr. Cummings indeed appears to be the county's chancery court clerk,[5] but Plaintiff produces no evidence that he is assisting in the search for Mr. Ables. Plaintiff adds that he "did not even know of [the deed's] existence until Dec. 29, 2014." (*Id.* at 649.) Plaintiff's chronology is mistaken: his amended complaint, filed in June 2014, mentions the forged quitclaim deed. (Doc. 26 at 122.) He is also busy looking up other witnesses, including the two individuals who helped him incorporate Merlin Internet Services. (Doc. 65 at 651.) He cannot now recall their names and is seeking their information from the former corporation's officers who wound down the business in 1998. (*Id.*) Plaintiff offers to add Merlin Internet Services, Inc. as a co-plaintiff if the Court deems necessary. (*Id.*)

The remainder of the sur-reply addresses evidence that Plaintiff might get in the future or that others could acquire if they cared to check. For example, he says that his bank records would show that Defendants never paid him after selling the Michigan real estate. (*Id.* at 652.) He does not claim to have the records, that he is attempting to obtain them, or that anyone else should seek them; but he insists they support his case nonetheless. (*Id.*) Similarly, "a subpoena of the phone records of Defendants [sic] former phone numbers would show" that he often called his oldest daughter, Victoria Young Hill. (*Id.* at 653.) Again, he does not say that he will subpoena the records or even how they help his case, and he somehow works into his analysis an accusation that Defendant Carol Walker physically assaulted his daughter. (*Id.*) In contrast, he has written his former counsel for an affidavit; none appear in the record, however. (*Id.* at 652.) Research is difficult, he asserts, because he can only submit one request for legal research to the

---

[5] Mississippi Chancery Clerks Association, *Directory*, http://www.mschca.org/tishomingo/ (last accessed July 23, 2015.)

law library and does not receive a response until a few days later. (*Id.* at 654.) Legal mailings occur on Tuesdays only, he adds. (*Id.*)

Plaintiff also seeks to contradict Defendants' assertion that his wife disposed of much property. He does this by offering a letter from Christina Oakley, one that he had already attached to previous briefs, in which she states that she visited Mississippi with Plaintiff's mother and Defendant Carol Walker after Plaintiff's arrest. (*Id.*, Ex. A.) He explains that he has no copies of the letter he sent Ms. Oakley rescinding the Carol Walker's power of attorney because the law library was closed when he sent it. (*Id.* at 653.)

## III.    Diversity Jurisdiction and Choice of Law

Neither party addresses whether Michigan or Mississippi law applies to this case; Plaintiff, understandably, because he is *pro se*, and Defendants, also understandably, because Plaintiff's claim so clearly lacks evidentiary support that it could not prevail regardless of which laws applied. Laws from each state are smattered throughout the Plaintiff's pleading and briefing. The complaint cites only one relevant statute, a Mississippi provision allowing for increased damages in conversion actions, among others, where the plaintiff was a statutorily-defined "vulnerable adult." (Doc. 26 at 99 (citing Miss. Code Ann. § 11-7-165).) Yet he also cites Michigan criminal statutes in other portions of his complaint. (*Id.* at 99-100.) Defendants apply Michigan's law on conversion. (Doc. 53 at 461.) Both parties leave unclear the legal basis for Plaintiff's claim that Defendants swindled his interest in the Michigan real estate. Finally, the power of attorney states that Mississippi law is to "govern all questions as to the validity of this power and the construction of its provisions." (*Id.*, Ex. C at 484.)

Generally, a federal court sitting in diversity jurisdiction looks to the choice-of-law provisions of its forum state. *See Day & Zimmerman, Inc. v. Challoner*, 423 U.S. 3, 4 (1975);

16

*Pedicini v. Life Ins. Co. of Alabama*, 682 F.3d 522, 526 (6th Cir. 2012). Michigan courts presume that Michigan law applies to tort claims brought in the state unless there is a "rational reason" to employ another state's law. *Olmstead v. Anderson*, 400 N.W.2d 292, 305 (Mich. 1987); *see also Standard Fire Ins. Co. v. Ford Motor Co.*, 723 F.3d 690, 696 (6th Cir. 2013). The "rational reason" inquiry first asks whether a "foreign state has an interest in having its law applied," and if so, whether Michigan's interest in applying its law nonetheless prevails over the foreign state's interest. *Sutherland v. Kennington Truck Serv., Ltd.*, 562 N.W.2d 466, 471 (Mich. 1997); *see also Johnson v. Doodson Ins. Brokerage of Texas, LLC*, 1 F. Supp. 3d 776, 783 (E.D. Mich. 2014). This "'balancing approach most frequently favors using the forum's (Michigan's) law.'" *Diamond Computer Sys., Inc. v. SBC Commc'ns, Inc.*, 424 F. Supp. 2d 970, 980 (E.D. Mich. 2006) (quoting *Hall v. Gen. Motors Corp.*, 582 N.W.2d 866, 868 (Mich. Ct. App. 1998)). Additionally, Michigan honors contractual choice of law provisions except when the chosen state has no relation to the transaction or that state's law contravenes a fundamental policy of Michigan law. *Johnson v. Ventra Grp., Inc.*, 191 F.3d 732, 739 (6th Cir. 1999); *Chrysler Corp. v. Skyline Indus. Servs., Inc.*, 528 N.W.2d 698, 703-04 (Mich. 1995).

Thankfully, however, the choice-of-law analysis is unnecessary in the present case because the relevant states' laws do not conflict in any meaningful manner. When no conflict is present, "'no need exists to make a choice of law decision.'" *McKerchie v. Wisconsin Cent. Ltd.*, 994 F. Supp. 2d 875, 880 (W.D. Mich. 2014) (quoting *Saab Auto. AB v. Gen. Motors Co.*, 953 F. Supp. 2d 782, 787 (E.D. Mich. 2013)); *see also Johnson*, 1 F. Supp. 3d at 782 (noting that the forum state law applies when there is no conflict); *Inland Waters Pollution Control, Inc. v. Jigawon, Inc.*, No. 05-74785, 2008 WL 205209, at *8 (E.D. Mich. Jan. 22, 2008) (same). As demonstrated below, this case does not turn on any fine distinctions between Mississippi and

17

Michigan law. The laws do not conflict, either in substance or in their practical effect on Plaintiff's claim. Rather, Plaintiff's inability to meet his evidentiary burden largely resolves the matter. Consequently, the outcome "would be the same no matter which state's law is applied." *McKerchie*, 994 F. Supp. 2d at 880.

## IV.   <u>Discussion</u>

### A.   *Summary Judgment Standard*

A motion for summary judgment will be granted under Rule 56 of the Federal Rules of Civil Procedure when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). All facts and inferences must be viewed in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The moving party has "'the initial burden of showing the absence of a genuine issue of material fact' as to an essential element of the non-movant's case." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989) (quoting *Celotex Corp. v Catrett*, 477 U.S. 317, 323 (1986)). In determining whether the moving party has met its considerable burden, a court may consider the plausibility of the moving party's evidence. *Matsushita*, 475 U.S. at 587-88. Summary judgment is also proper where the moving party shows that the non-moving party is unable to meet its burden of proof. *Celotex*, 477 U.S. at 325.

The non-moving party cannot rest merely on the pleadings in response to a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Instead, the non-moving party has an obligation to present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos.*, 8 F.3d 335, 339-40 (6th Cir. 1993). The non-movant cannot withhold evidence until trial or rely on

speculative possibilities that material issues of fact will appear later. 10B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2739 (3d ed. 1998). "[T]o withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict those offered by the moving party." *Cosmas v. American Express Centurion Bank*, 757 F. Supp. 2d 489, 492 (D. N.J. 2010). In doing so, the nonmoving party cannot simply assert that the other side's evidence lacks credibility. *Id.* at 493. And while a *pro se* party's arguments are entitled to liberal construction, "this liberal standard does not, however, 'relieve [the party] of his duty to meet the requirements necessary to defeat a motion for summary judgment.'" *Veloz v. New York*, 339 F. Supp. 2d 505, 513 (S.D. N.Y. 2004) (quoting *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 50 (2d Cir. 2003)). "[A] pro se party's 'bald assertion,' completely unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Lee v. Coughlin*, 902 F. Supp. 424, 429 (S.D. N.Y. 1995) (quoting *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991)).

When the non-moving party fails to adequately respond to a summary judgment motion, a district court is not required to search the record to determine whether genuine issues of material fact exist. *Street*, 886 F.2d at 1479-80. The court will rely on the "facts presented and designated by the moving party." *Guarino v. Brookfield Twp. Trustees*, 980 F.2d 399, 404 (6th Cir. 1992). After examining the evidence designated by the parties, the court then determines "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304, 1310 (6th Cir. 1989) (quoting *Anderson*, 477 U.S. at 251-52). Summary judgment will not be granted "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

The scope of the materials a court can review at this stage ultimately is cabined by evidentiary standards. The point bears noting here as Plaintiff has produced mostly unauthenticated exhibits, stuffed with hearsay, to support its motion. Rule 56 allows a party to support their position on summary judgment by citing "materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials . . . ." Fed. R. Civ. P. 56(c)(1)(B). The court can also consider any materials in the record not cited by the parties. Fed. R. Civ. P. 56(c)(3). However, statements in a party's brief are not admissible and are not in Rule 56's list of evidence the Court can consider. *Caruthers v. Correctional Med. Serv., Inc.*, No. 1:10-cv-274, 2011 WL 6402278, at *2 (E.D. Mich. Dec. 21, 2011). Consequently, "[i]t is well established that statements appearing in a party's brief are not evidence." *Id.* (citing *Duha v. Agrium, Inc.*, 448 F.3d 867, 879 (6th Cir. 2006)).

The screening factor, eliminating materials from consideration, comes into play if a party objects that "the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). This mostly tracks the Supreme Court's opinion in *Celotex*, in which the Court denied that "the nonmoving party must produce evidence in a form that would be admissible at trial in order to avoid summary judgment." 477 U.S. at 324. The evidence should be admissible but does not necessarily need to be presented in an admissible form at this point. *See Orr v. Bank of America, NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002) ("A trial court can only consider admissible evidence in ruling on a motion for summary judgment."); *McMillian v. Johnson*, 88 F.3d 1573, 1584 (11th Cir. 1996) (finding that the *Celotex* opinion allowed "*otherwise admissible* evidence to be submitted in *inadmissible form* at the summary judgment stage, though at trial it must be submitted in admissible form").

Ultimately, as Judge Richard Posner observed, the party proffering a piece of evidence must show, or it must be "obvious," that the evidence "can be replaced by proper evidence at trial." *Eisenstadt v. Centel Corp.*, 113 F.3d 738, 742 (7th Cir. 1997).

Prior to adoption of the current Rule 56 in 2010, the Sixth Circuit had consistently held that that "documents presented in connection with a summary judgment motion must be authenticated." *Foreword Magazine, Inc. v. OverDrive, Inc.*, No. 1:10-cv-1144, 2011 WL 5169384, at *1 (W.D. Mich. Oct. 31, 2011); *See also Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009) (noting "this court's repeated emphasis that unauthenticated documents do not meet the requirements of Rule 56(e)"). However, courts in this Circuit have found that, in light of the 2010 changes, authentication is no longer required. *See Foreword Magazine, Inc.*, 2011 WL 5169384, at *2; *see also Pawlaczyk v. Besser Credit Union*, No. 14-cv-10983, 2015 WL 4208649, at *7-9 (E.D. Mich. Apr. 13, 2015) (discussing authentication requirement and considering unauthenticated documents), *Report & Recommendation adopted by* 2015 WL 4208658 (E.D. Mich. July 10, 2015); *Deakins v. Pack*, 957 F. Supp. 2d 703, 752 (S.D. W.V. 2013) (noting the authentication requirement has been eliminated); *Loadman Grp., L.L.C., v. Banco Popular North America*, No. 4:10cv1759, 2013 WL 1154528, at *9 (N.D. Ohio Mar. 19, 2013) ("[S]ince the 2010 amendments . . . [parties] are no longer required to attach to the affidavits copies of papers referred therein."); *Smith v. MERS*, No. 10-12508, 2012 WL 1963605, at *1 n.1 (E.D. Mich. May 9, 2012) (same), *Report & Recommendation adopted by* 2012 WL 1963604, at *1 (E.D. Mich. May 31, 2012); *Akers v. Beal Bank*, 845 F. Supp. 2d 238, 243 (D. D.C. 2012) (same); *Jeffrey v. Royal Oak Police Dep't*, No. 10-10463, 2011 WL 3849417, at *2 n.1 (E.D. Mich. July 27, 2011) (same), *Report & Recommendation adopted by* 2011 WL 3799775, at *1 (E.D. Mich. Aug. 26, 2011). This reflects the Advisory Committee notes, which

21

indicate that the amendments were intended to remove this requirement and allow courts to examine any admissible materials in the record: the authentication clause was "omitted as unnecessary given the requirement in subdivision (c)(1)(A) that a statement or dispute of fact be supported by materials in the record." Fed. R. Civ. P. 56, 2010 advisory committee's note.

Both parties provide various documents that are potentially inadmissible. With a few minor exceptions, Plaintiff's entire evidentiary offering consists of such documents. In fact, most of his evidence is in the form of unauthenticated letters containing reports of statements other people might have made. For example, in one his sister Christina relates the opinion of unidentified lawyers that his family could not help Plaintiff "as long as Carol is your overseer." (Doc. 26, Ex. D at 104.) Others are possibly admissible opposing-party statements, Fed. R. Evid. 801(d)(2)(A); *see also Canter v. Hardy*, 188 F. Supp. 2d 773, 782-83 (E.D. Mich. 2002), including letters purportedly from Carol Walker or from others containing statements she allegedly made. *See, e.g.*, (*id.*, Ex. E at 106-08; *id.*, Ex. F at 113-14; *id.*, Ex. G at 117.) Defendants offer their own unauthenticated letters, though these were allegedly written by Plaintiff. (Doc. 53, Ex. A at 476; *id.*, Ex. D at 487; *id.*, Ex. G at 497; *id.*, Ex. H at 499-500.)

While Defendants complain of the inadmissible hearsay evidence Plaintiff offers, they do not describe in any detail which statements are hearsay or why they should be excluded. (*Id.* at 460.) Nor has Plaintiff addressed the issue. Consequently, Defendants may have preserved their right to object to the admission of improper evidence, *see Bennet v. Univ. Hospitals of Cleveland*, 981 F. Supp. 1065, 1068 (N.D. Ohio 1997) (citing *Wiley v. United States*, 20 F.3d 222, 226 (6th Cir. 1994)), but they have failed to shed any light for this Court on what that objection might entail. Thus to weed out inadmissible evidence at this point, the Court would have to construct arguments for both parties. The Court declines to do so; though of course, it

will not rely on any clearly inadmissible evidence. In any case, such a minute parsing of the evidence is unnecessary. Even if Plaintiff could find grounds for admitting all of his contested documents, and excluding Defendants' questionable evidence, he would still lose. As discussed below, the evidence he assembles often proves irrelevant to his contentions, and it frequently supports the other side.

### B.    Merlin Internet Services's Computer Property

Plaintiff's complaint contains three discrete lists of property that Defendants allegedly converted. (Doc. 26, Exs A-C at 101-03.) The first two include nearly $100,000 worth of computer hardware and software. Yet, in an attempt to evade the effects of Defendant Carol Walker's power of attorney, Plaintiff denies owning this property. (Doc. 61 at 573.) Because it is not his, he is not the real party in interest and thus cannot bring claims for its conversion.

Only the "real party in interest" can bring an action in court. Fed. R. Civ. P. 17(a); Mich. Ct. R. 2.201(B); Miss. R. Civ. P. 17(a). The "real party in interest is the person who is entitled to enforce the right asserted under the governing substantive law," and the "analysis turns upon whether the substantive law creating the right being sued upon affords the party bringing the suit a substantive right to relief." *Certain Interested Underwriters at Lloyd's, Olndong, England v. Layne*, 26 F.3d 39, 42-43 (6th Cir. 1994). In other words, the rights asserted must be the plaintiff's and not those of a third party. *Porter v. City of Highland Park*, No. 318917, 2015 WL 728642, at *3 (Mich. Ct. App. Feb. 19, 2015); *see also Welch Roofing & Constr., Inc. v. Farina*, 99 So.3d 274, 278 (Miss. Ct. App. 2012). If the plaintiff is not the proper party, the court can dismiss the action or claims when the real party in interest has not ratified or joined the action after a reasonable time has passed. *White v. JP Morgan Chase Bank, NA*, 521 F. App'x 425, 428 (6th Cir. 2013); Fed. R. Civ. P. 17(a)(3); Miss. R. Civ. P. 17(a).

A conversion claim belongs to the person or entity wrongfully disposed of property. *JP Morgan Chase Bank, NA v. Jackson GR, Inc.*, No. 311650, 2014 WL 3529088, at *7 (Mich. Ct. App. July 15, 2014); *see also PACCAR Fin. Corp. v. Howard*, 615 So.2d 583, 588 (Miss. 1993) (defining conversion as the wrongful interference of property in defiance of the plaintiff's rights). If that entity is a corporation, either it or its successors in interest must bring the claim. Under Michigan law, corporations are legally separate from their shareholders, *Belle Isle Grill Corp. v. City of Detroit*, 666 N.W.2d 271, 278 (Mich. Ct. App. 2003), and consequently they "are generally required to file actions in the name of the entity and not that of a stockholder or an officer." *White*, 521 F. App'x at 428 (citing *Michigan Nat'l Bank v. Mudgett*, 444 N.W.2d 534, 536 (Mich. Ct. App. 1989)); *see also* Mich. Ct. R. 2.201(C)(4). The law is the same in Mississippi: "[I]n Mississippi . . . an action to redress injuries to a corporation, whether arising in contract or in tort cannot be maintained by a stockholder in his own name, but must be brought by the corporation because the action belongs to the corporation and not the individual stockholders whose rights are merely derivative." *Bruno v. Southeastern Servs., Inc.*, 385 So.2d 620, 622 (Miss. 1980).

The corporation here, Merlin Internet Services, would be the real party in interest because it owned the property Defendants allegedly converted. Plaintiff does not suggest he had a distinct interest in the property (Doc. 61 at 574); but it dissolved in 1998. (Doc. 60, Ex. A at 570.) *See also Cmty. Bank, Ellisville, Mississippi v. Courtney*, 884 So.2d 767, 772 (Miss. 2004) ("It is elementary that ownership is an essential element of conversion."). Dissolved corporations lack capacity to sue except for winding up affairs. *See 4 H Contr. Corp. v. Superior Boat Works, Inc.*, 579 F. App'x 278, 281 (5th Cir. 2014) ("Mississippi Courts have held that the power of a corporation to file a lawsuit expires if the corporation is suspended."); *Royer Homes of*

*Mississippi, Inc. v. Steiner*, 131 So.3d 592, 593 (Miss. Ct. App. 2013) (noting that dissolved corporations cannot carry on business except to wind up their business affairs, which might include commencing lawsuits); *Flint Cold Storage v. Dep't of Treasury*, 776 N.W.2d 387, 394 (Mich. Ct. App. 2009) (same); *Funderburg v. Pontotoc Elec. Power Ass'n*, 6 So.3d 439, 442 (Miss. Ct. App. 2009) (noting general rule against lawsuits brought by dissolved corporations). Thus, the corporation could not likely bring the present action; but that does not mean that Plaintiff becomes the "real party in interest" by default. The fact remains that he does not own the property, and the only interest he might claim—which he does not—would be derivative and residual.

The court rules prevent dismissal of an action for failure to prosecute in the name of the real party in interest unless "a reasonable time has been allowed for the real party in interest to ratify, join, or be substituted into the action." Fed. R. Civ. P. 17(a)(3); *see also* Miss. R. Civ. P. 17(a). But Plaintiff has not presented any information regarding the corporation's successors in interest or other party who could properly join this action. As a result, even if the Court were inclined to allow the real party in interest to join, it is unclear who that party would be. Further, this case is two years old and deals with events that occurred almost twenty years ago. Plaintiff was made aware in March 2015 that he might not be the proper party to submit this claim. (Doc. 53.) While he offers to add the dissolved corporation as a co-plaintiff if the Court requests, he has made no motion to do so and it would likely fail for the reasons above in any event. (Doc. 65 at 651.) In short, Plaintiff has had ample time to locate the real party in interest and seek its joinder. Dismissal of this portion of his claims is thus proper under Rule 17.

**C.     *Other Personal Property***

25

Regarding the other personal property the complaint mentions, Plaintiff has not provided sufficient evidence to create a material issue of fact. Defendant Carol Walker's power of attorney is fatal to Plaintiff's claim, and Plaintiff has done nothing to cast doubt on its validity or its application in this case. Defendants' actions pursuant to the power of attorney did not interfere with Plaintiff's interest in the property. To the extent Plaintiff alleges any acts that would fall outside the scope of the powers he granted Defendants, he has not presented evidence supporting his contentions.[6]

Plaintiff's lone discernable claim is that Defendants converted his property. (Doc. 26 at 97; Doc. 61 at 580.) As noted, he cites a Mississippi statute allowing triple damages when the victim of conversion is a statutorily defined "vulnerable adult." (Doc. 26 at 99.) That statute, passed in 2007, has received only passing mentions in court opinions. *See McGuffie v. Anderson*, No. 3:13-cv-888, 2014 WL 4658971, at *1 (S.D. Miss. Sept. 17, 2014) (citing statute once, but failing to discuss it); *Pepper v. Homesales, Inc.*, No. 1:08CV344, 2009 WL 544141, at *7 (S.D. Miss. Mar. 3, 2009) (quoting the complaint, which cited the statute, but not addressing the statute's substance). It is reasonably clear, however, that the statute simply addresses damages in

---

[6] The Court cannot conceive how Plaintiff's claims, with the possible exception of his quitclaim deed argument (Doc. 66 at 677), could be considered timely. Michigan's statute of limitations for conversion, both common law and statutory, is three years after the claim accrued, the same length as Mississippi's statute of limitations. *See* Mich. Comp. Laws § 600.5805; Miss. Code Ann. § 15-1-49(1); *Brilinski v. Merit Energy Co., LLC*, No. 14-cv-10015, 2015 WL 418091, at *3 (Mich. Ct. App. Jan. 30, 2015); *Lott v. Saulters*, 133 So.3d 794, 803 (Miss. 2014); *Pierzchala v. MGM Grand Detroit, LLC*, No. 302874, 2013 WL 2662881, at *3 (Mich. Ct. App. June 13, 2013). Although not entirely clear, the relevant acts giving rise to the conversion claim seem to have occurred around 1998. Plaintiff, attempting to circumvent the power of attorney, dates the conversion in 1997. (Doc. 62 at 580, 587.) In any case, nearly 20 years have elapsed since the claim accrued. Plaintiff does not suggest a plausible excuse for the delay. At one point, he implies that he took action in 2011 after learning that Defendant Carol Walker was not his guardian. (Doc. 62 at 581-82.) He does not show this mistaken belief was reasonable or why it would cloud the conversion claim. Nonetheless, "it ordinarily is error for a district court to raise the issue *sua sponte*," *Haskell v. Washington Tp.*, 864 F.2d 1266, 1273 (6th Cir. 1988), unless the defense "clearly appears on the face of a pleading." *Watson v. Wayne Cnty.*, 90 F. App'x 814, 815 (6th Cir. 2004). Here, Defendants have not raised the issue and the pleadings do not clearly demonstrate that the defense applies. Therefore, the Court cannot rely on this additional ground.

civil actions for conversion, among others, and that the plaintiff must still prove the underlying conversion.

The statute's only other relevant feature is its definition of "Vulnerable adult," defined by cross reference to include any person unable to perform normal activities or provide for his or her own care due to mental, emotional, or physical disabilities, or to "the infirmities of aging." Miss. Code. Ann. §§ 11-7-165(3), 43-47-5(q). Plaintiff makes no attempt to demonstrate he meets this definition. The statutory damages provision would not apply, then, even if he could prove conversion.

The elements of conversion in Mississippi and Michigan law do not differ in any manner meaningful in this case. Under Mississippi law, "'[t]o make out a conversion, there must be proof of a wrongful possession, or the exercise of a dominion in exclusion or defiance of the owner's right, or of an unauthorized and injurious use, or of a wrongful detention after demand.'" *Courtney*, 884 So.2d at 773 (quoting *First Investors Corp. v. Rayner*, 738 So.2d 228, 234-35 (Miss. 1999)). Michigan law has conversion actions by both common law and statute. In the former, conversion is "any conduct inconsistent with the owner's property rights," such as exercising unauthorized domain over the property or intentionally destroying it. *Aroma Wines & Equip., Inc. v. Columbian Distrib. Servs., Inc.*, —N.W.2d—, slip op. at *16 (Mich. 2015); *see also Foremost Ins. Co. v. Allstate Ins. Co.*, 486 N.W.2d 600, 606 (Mich. 1992) ("[C]onversion is defined as any distinct act of domain wrongfully exerted over another's personal property in denial of or inconsistent with the rights therein."); *Belcher v. Ranney*, 179 N.W. 36, 37 (Mich. 1920) ("'To constitute an unlawful conversion, you must find that, while the plaintiff was entitled to immediate possession, he (plaintiff) made a legal demand, and that then defendant under such circumstances refused or neglected to deliver this property to plaintiff." (quoting with

27

approval the trial court's jury instructions.)). In addition, a party properly in possession of property can convert that property by using it in an "improper way, for an improper purpose, or by delivering it without authorization to a third party." *Dep't of Agriculture v. Appletree Marketing, LLC*, 779 N.W.2d 237, 244-45 (Mich. 2010). In both states, the defendant must intend to do the act constituting conversion. *See Courtney*, 884 So.2d at 774; *Shelton & Assoc., PC v. Mayer*, No. 217456, 2001 WL 732397, at *3 (Mich. Ct. App. June 12, 2001).

Statutory conversion in Mich. Comp. Law § 600.2919a is undefined. Consequently, courts rely on the common law definition set out above. *See Kalitta Air, LLC v. GSBD & Assoc., LLC*, No. 12-CV-13554, 2013 WL 3271820, at *5 (E.D. Mich. June 27, 2013); *Gillis v. Wells Fargo Bank, NA*, No. 12-10734, 2013 WL 2250215, at *5 (E.D. Mich. May 22, 2013); *Paul v. Paul*, No. 311609, 2013 WL 6670832, at *2 (Mich. Ct. App. Dec. 17, 2013); *Victory Estates, LLC*, No. 307457, 2012 WL 6913826, at *2 (Mich. Ct. App. Nov. 20, 2012). The statute contains an additional requirement setting it apart from its common law counterpart: the conversion must be for the convertor's "own use." Mich. Comp. Law § 600.2919a; *see also Aroma Wines*, slip op. at *17-18. The "own use" provision "requires a showing that the defendant employed the converted property for some purpose personal to the defendant's interests, even if that purpose is not the object's ordinarily intended purpose." *Aroma Wines*, slip op. at *22.

Defendant Carol Walker's power of attorney authorized her to manage Plaintiff's property, thus undercutting his conversion claim. A durable power of attorney, like the one executed here (Doc. 53, Ex. C at 485), transforms the holder into an attorney-in-fact with the ability to manage the principal's affairs, in accordance with the provisions of the agreement and general fiduciary standards, despite the principal later becoming disabled or incapacitated. Mich. Comp. Laws § 700.5501; Miss. Code Ann. § 87-3-105; *In re Estate of Capuzzi*, 684 N.W.2d 677,

28

679 (Mich. 2004) ("A power of attorney provides the agent with all the rights and responsibilities of the principal as outlined in the agreement."); *In re Cadarette Estate*, No. 284132, 2009 WL 1607701, at *1 (Mich. Ct. App. June 9, 2009) ("[T]he grant of a general power of attorney creates a fiduciary relationship."); *Clark v. Ritchey*, 759 So.2d 516, 518 (Miss. Ct. App. 2000) ("A designated power of attorney is nothing more than one form of principal-agen[t] relationship."). The attorney-in-fact must "act for the benefit of the [principal] on matters within the scope of the relationship. *In re Cadarette Estate*, 2009 WL 1607701, at *1. One of the primary purposes of a "power of attorney is to evidence the delegation of authority to perform particular legal acts, which the principal could personally perform, to an appointed agent." *Persinger v. Holst*, 639 N.W.2d 594, 597 (Mich. Ct. App. 2001). In Mississippi, which governs the validity of the power here, a valid power of authority consists of a "written instrument signed by the principal and expressing plainly the authority conferred." *Kountouris v. Varvaris*, 476 So.2d 599, 604 (Miss. 1985); *see also* Miss. Code Ann. § 87-3-105.

The power of attorney does not immunize the attorney-in-fact from conversion claims. *Boyce v. Fernandes*, 77 F.3d 946, 950 (7th Cir. 1996). Indeed, the sensitive nature of the relationship creates fiduciary obligations, imposing heightened duties and restricting opportunities for self-dealing. *See id.*; *see also* Mich. Comp. Law § 700.5501(3)(g) (providing that the attorney-in-fact can be liable for breach of fiduciary duties); *McKinney v. King*, 498 So.2d 387, 388 (Miss. 1986) (discussing a power of attorney and noting, "[i]t is fundamental law that an agent owes his principal absolute good faith and fidelity, and he cannot in the exercise of his authority as agent acquire property or interest therein rightfully belonging to his principal without full disclosure and consent of his principal"); *In re Susser Estate*, 657 N.W.2d 147, 150 (Mich. Ct. App. 2002) (noting previous case law holding "that an attorney in fact could be held

liable to her principal's estate if she converted his funds to herself without his authorization"). But if the agreement authorized the disputed act, such as writing a check on the principal's behalf, then the act is not an exercise of wrongful domain over the principal's property and is not conversion. *See, e.g.*, *Carpenter v. Layne*, 374 S.W.3d 871, 878 (Ark. Ct. App. 2010) (denying conversion claim where the defendant's power of attorney authorized the actions).

Plaintiff does not allege any breach of fiduciary duties and he does not develop a direct attack on the power of attorney's validity. He states, however, that he was coerced into signing it at a time when he suffered from mental and emotional problems. (Doc. 61 at 578, 580-83.) According to his brief, he had refused to provide Defendants a power of attorney until he was threatened by Defendant Carol Walker, placed in the prison psychiatric ward, and cut off from social contact. (*Id.*) It is true that an individual must be mentally competent—that is, able to understand the nature and effect of his or her actions—in order to create a power of attorney. *See Dowdy v. Smith*, 818 So.2d 1255, 1258-59 (Miss. Ct. App. 2002); *Persinger*, 639 N.W.2d at 597. Even assuming that Plaintiff's story alleges the requisite mental defects, he offers no evidence in support. There are no records from the psychiatric ward or prison materials documenting this episode. The letter containing Carol Walker's alleged threats, which accompanied the legal document, is not present. No affidavits from hospital or prison workers appear. All that he offers concerning his mental health is a subpoena to a doctor during the criminal proceedings in 1998 and a "Physician's Orders" form from May 1998 signed by the same doctor discharging Plaintiff to the sheriff's custody, prescribing Prozac, and mentioning Plaintiff's suicidal ideations. (Doc. 61, Ex. A at 591-92.)

The latter document could suggest he was hospitalized due to his mental health. But it cannot form the basis for the facts alleged in his complaint, as it does not mention a power of

attorney or any of Plaintiff's other allegations. It is speculative and far removed from the relevant legal dispute; even assuming it shows he was hospitalized at some point in 1998, from this the Court would have to infer that he was mentally incompetent to sign the document and that it is invalid. Plaintiff himself does not directly draw out these speculative inferences and does not advance the relevant legal argument to invalidate the power of attorney. These are not the sort of "justifiable inferences" the court must make in his favor. *See Anderson*, 477 U.S. at 255. Stripped of these documents, all that remains to Plaintiff's argument is the factual recitation in his brief. But this does not constitute evidence, *Caruthers*, 2011 WL 6402278, at *2, and consequently he has not raised a factual issue regarding the power of attorney's validity.

His allegations that he rescinded the document similarly lack support. He offers a letter from Defendant Carol Walker stating, "[D]o what you want as for the guardian." (Doc. 61, Ex. E at 602-03.) This fails to show a rescission. He states that he sent Christina Oakley a full power of attorney, presumably intending to revoke the prior one. (Doc. 26 at 99.) The letter is lost, however, because he could not copy it at the time. (Doc. 65 at 653.) Further, Ms. Oakley has attested that Plaintiff "never granted me a Power of Attorney." (Doc. 36 at 172.) Consequently, there is no evidence that he rescinded the power. Even if he had, most of his allegations concern Defendant's actions in the late 1990s, when the power indisputably remained in effect.[7]

Under the power of attorney, Defendant Carol Walker was authorized to do nearly everything Plaintiff alleges that she did. She could "exercise or perform any act, power, duty, right or obligation whatsoever that I now have or may hereafter acquire, relating to any person, matter, transaction of property, real or personal . . . now owned or hereafter acquired." (Doc. 53,

---

[7] Plaintiff also argues that Defendants terminated the power during this litigation when their attorney wrote Plaintiff that they did not want to continue holding his property and asked Plaintiff to arrange for someone else to keep it. (Doc. 62 at 587; *id.*, Ex. K at 619.) But they would not convert the property by continuing to hold it for Plaintiff while they waited for him to find another keeper.

Ex. C at 480.) She could buy and sell his personal property, including automobiles. (*Id.*, Ex. C at 481-82.) Plaintiff even entrusted Carol Walker with his "full powers as a substitute parent to my child." (*Id.*, Ex. C at 484.) The power of attorney prohibits her from diverting Plaintiff's assets to herself or her agents. (*Id.*, Ex. C at 483.)

Thus when Defendant Carol Walker, with the help of her husband, Defendant Ferry Walker, "took possession of and removed to their residence [in Michigan] . . . all of [Plaintiff's] personal and business property/effects," they were doing exactly what the power of attorney envisioned. (Doc. 26 at 97.) Their exercise of dominion over Plaintiff's property was not wrongful and did not interfere with his rights. Thus they did not convert the property.

Plaintiff makes a few allegations of actions that potentially overstepped Defendant's authority. He notes that he has seen photographs of his deer head hanging on Defendant's wall. (*Id.* at 99.) Arguably, this personal use of his property might be unauthorized. But again, Plaintiff provides no evidence establishing that Defendants are decorating their house with his property or making any other private use of it.

The destruction of Plaintiff's car also could fall outside Defendants' authority and constitute conversion. *See Thoma v. Tracy Motor Sales, Inc.*, 104 N.W.2d 360, 362 (Mich. 1960) (noting that intentional destruction of property constitutes conversion). Plaintiff's allegations are jumbled, however, and he again offers no evidence to support them. The first letter he attaches discussing the car actually corroborates Defendants' claim that it caught on fire while Ferry Walker was making repairs requited by Plaintiff. (*Id.*, Ex. F at 113.) According to Plaintiff, later letters, which he does not provide, suggest that the fire was intentional. (*Id.* at 98.) Against this, Defendants have attested to their version of events. (Doc. 37; Doc. 55.)

32

The Court is again left with unsubstantiated statements in Plaintiff's pleading, which do not constitute evidence. Further, the statements are not clearly from Defendants, and thus constitute hearsay about which Plaintiff could not testify. He has also failed to provide any evidence regarding the car's value. Still, Defendants admit that the car was destroyed. Destruction can constitute conversion, and it was not authorized in the power of attorney. They state, however, that blaze began after Ferry Walker, following Plaintiff's instructions given during a prison visit, put gasoline in the carburetor. (Doc. 37 at 174; Doc. 55 at 522.) Plaintiff never addresses, and thus does not deny, that he gave these instructions. As the Defendants' affidavits are the only true evidence on this event, there is no material dispute. And because Defendants were acting as Plaintiff's agents in this matter, they did not interfere with his rights in the car. Plaintiff has not established any other legal claims based on the fire, such as negligence, and none of the admissible evidence suggests that Defendants acted maliciously or negligently. *Cf. Price v. High Pointe Oil Co., Inc.*, 828 N.W.2d 660 (discussing claims of negligent destruction of property).

Plaintiff suspects that the car was not the only item that went up in smoke. A note from Aunt Dee said that Carol Walker was claiming to have burned his violin.[8] (Doc. 26, Ex. G at 117.) This is the only evidence Plaintiff presents that suggests Defendants converted the violin by destroying it. Defendants deny torching the violin; instead they gave it to Tina Lamoureaux to hold for the benefit of her daughter, as Plaintiff instructed. (Doc. 55 at 522.) They attach a letter from Plaintiff to Ms. Lamoureaux stating that he would "do everything within [his] power to see to it that Natasha's children (when in the future she marries & has some) get my violin (unless the claims that Carol is making that she burned it are true." (Doc. 53, Ex. H at 499.) During the course of this litigation, Plaintiff has backed away from his suspicion that Defendants burned the

---

[8] The note also contains hearsay statements from others denying that the violin had been burned. (*Id.*)

33

violin. (Doc. 61 at 583.) He now instead complains that they have not proven to him the violin they gave Ms. Lamoureaux was his; but he supports this with a letter from Ms. Oakly stating that she did not believe Carol Walker burned the violin. (*Id.*, Ex. H at 611.)

The evidence concerning the violin does not create a material issue of fact. His current intention appears to be verifying that Defendants gave Ms. Lamoureaux the violin. A lawsuit alleging they converted it is not the proper manner for learning this information. Based on the evidence before the Court, a factfinder could not reasonably determine that Carol Walker burned the violin or otherwise destroyed it.

Plaintiff also contends that much of the conversion occurred before he granted Defendant Carol Walker the power of attorney. (Doc. 62 at 580, 587.) In fact, he says that the conversion took place 402 days before he signed the power of attorney, putting the conversion some time around June 1997, a few months after his arrest. (*Id.*) How he comes up with this number is a mystery. Perhaps he refers to his family's garage sale of his items. (Doc. 61 at 574.) Yet he provides no evidence demonstrating that Plaintiff took part in the garage sale or otherwise had control of his items prior to receiving the power of attorney. Plaintiff promises that a "simple check" with the sheriff could confirm that Defendants were part of the garage sale; yet he has failed to offer any police statements or records, and evidently has not "check[ed]" with them himself. (*Id.*) In contrast, Defendants have attested that they did not participate in the sale or receive any proceeds from it. (Doc. 37 at 173-74; Doc. 55 at 521-22.) Likewise, Plaintiff's mother attests that she conducted the sale with other family members. (Doc. 35 at 169.) There is thus no evidentiary basis for crediting his suspicion that Defendants sold his goods in the garage sale, or that they converted his property prior to obtaining the power of attorney.

Overall, Plaintiff has not shown that a material issue of fact exists. Conducting this case *pro se* from prison a thousand miles away, he naturally relies on what others tell him. But even when this hearsay is excised, the meager evidence he presents fails to give rise to any reasonable inferences supporting his case. For example, the letter from Carol Walker telling Plaintiff to "do what you want as for the guardian," does not prove anything useful to his case. (Doc.26, Ex. F at 113; Doc. 62, Ex. E at 602-03.) Similarly, a factfinder could not reasonably infer from Ms. Oakley's letter—stating that she was in Mississippi with Defendant Carol Walker and Clara Hill, but not saying when or why—that Defendants stole his property. (Doc. 62, Ex. D at 599.) In any event, Ms. Oakley has signed an affidavit attesting that she never discussed with Plaintiff the property issues raised in his complaint and that she has no personal knowledge of the facts in this case. (Doc. 36 at 171-72.) He attacks his mother's credibility by casting aspersions on her character, a tactic that is as irrelevant as it is legally insufficient. *See Cosmas*, 757 F. Supp. 2d at 492.

Instead of presenting actual evidence, Plaintiff relies on speculations about evidence that might exist, testimony that witnesses would perhaps give if they could be found, documents that could corroborate his case if anyone cares to look them up. To prove that Defendants participated in the pre-power of attorney garage sale, for example, Plaintiff says that a "simple check" with the county sheriff would confirm his story. (Doc. 62 at 574.) Of course, he has not done so. And, as Plaintiff was not at the garage sale and offers no second hand reports that Defendants were there, he gives no reason to believe that the sheriff would confirm his speculation. Even more obtainable evidence, such as his bank records or the court order he mentions, are absent from his submissions. (*Id.* at 578, 587.) Other witnesses he plans to call, such as Clara Hill and Ms. Oakley, have submitted affidavits supporting Defendants' version of events. (*Id.* at 581.) Plaintiff

has not offered any reason to believe that they will either change their stories or that he can impeach them with inconsistent statements. Still other witnesses are something of a mystery to Plaintiff. Officers from his old corporation can testify about the property, including his personal boat, but he does not name them (*id.* at 584) and cannot recall the individuals with whom he formed the corporation. (Doc. 65 at 651.) Moreover, he is certain that Victoria Young Hill can support his contentions, as soon as the Court tracks her down. (Doc. 62 at 579-80.) Nothing he has provided suggests she has relevant information.

Plaintiff has not raised a material issue of fact regarding his contentions. As it stands, the evidence shows that Defendant Carol Walker acted pursuant to a valid power of attorney, and Defendant Ferry Walker assisted her. Because the power of attorney authorized her actions, it precludes Plaintiff's conversion claim. There is no evidence that Defendants acted outside its scope. Consequently, Defendants' motion for summary judgment should be granted.

### D.    *Michigan Real Property*

The parties spend considerable time arguing over Plaintiff's quitclaim deed to Defendants. While they trace the property's history in their narratives and with property deeds, the core issue is whether Plaintiff signed the quitclaim deed. He contends they forged his signature. (Doc. 26 at 122; Doc. 66.) According to Plaintiff, in 1994 Carol Walker asked for a quitclaim deed of his interest in the house so that she could sell it. (Doc. 66 at 677.) After refusing several times, she told him that the deeds needed to be stored at the home, so he sent her a quitclaim deed without signature. (*Id.*) During the present litigation, he learned that the deed had been signed and the house sold. (*Id.*) The signature is not his, he claims. His writing hand shakes as a result of a 1987 motorcycle accident, preventing him from signing with the fluid strokes evident on the quitclaim signature. (Doc. 62 at 574.) Defendants deny forging the

36

signature or fraudulently inducing him to sign it, pointing to the valid notarization by Hayden Ables, then Tishomingo County Chancery Clerk. (Doc. 53 at 470.)

As an initial matter, Plaintiff's conversion claim cannot encompass the wrongful deprivation of real property. Conversion actions in both Michigan and Mississippi are limited to personal property. *See Bounds v. Krause*, No. 319279, 2015 WL 1880203, at *3 (Mich. Ct. App. Apr. 23, 2015); *Reeves v. Meridian Southern Ry., LLC*, 61 So.3d 964, 967 (Miss. Ct. App. 2011); *Makridakis v. Makridakis*, No. 269685, 2007 WL 2404622, at *4 (Mich. Ct. App. Aug. 23, 2007). Plaintiff also cites criminal law prohibiting forgery, Mich. Comp. Laws §§ 750.248-750.249, but that statute does not provide a private cause of action. *See Wheeler v. McKelvy*, No. 14-cv-14672, 2015 WL 3441179, at *3 (E.D. Mich. May 28, 2015); *Koss v. RBS Citizens, N.A.*, 996 F. Supp. 2d 574, 589 (E.D. Mich. 2014); *Langley v. Chase Home Finance, LLC*, No. 1:10-cv-604, 2011 WL 1150772, at *6 (W.D. Mich. Mar. 11, 2011), *Report & Recommendation adopted by* 2011 WL 1130926 (W.D. Mich. Mar. 28, 2011). Thus, the legal basis for Plaintiff's claim is unclear. But under any theory, there would not be a material dispute concerning Plaintiff's central contention that Defendants forged his signature.

Unlike with his other factual contentions, Plaintiff has provided more substantial evidence to support his claim. Ultimately, however, the evidence does create a triable issue. Medical records from November 1988 confirm that he experienced head trauma and required surgery after crashing his motorcycle. (Doc. 62 at 594-95.) What they do not show is that the accident caused lingering health problems or affected his handwriting. To find that this raises a material issue of fact, the factfinder would have to make a series of unwarranted inferences.

Plaintiff also dabbles with forensic handwriting analysis, offering twenty exemplars of his signature and four affidavits containing lay opinions that the quitclaim signature does not

appear to be Plaintiff's. (Doc. 66, Exs. B-C at 683-708.) Defendants dispute the admissibility of all but one of the affidavits, adding that if they were admissible, the affiants would need to testify and be subject to cross-examination rather than simply submit an affidavit. (Doc. 68 at 725-26.)

The Sixth Circuit recently explained that to be admissible, lay opinion testimony seeking to authenticate handwriting must satisfy both Federal Rule of Evidence 701 and 901(b)(2). *United States v. Harris*, 786 F.3d 443, 446-47 (6th Cir. 2015). "In short, Rule 701 lays out the general rule regarding lay witness opinion testimony, and Rule 901(b)(2) provides the specific rule when such testimony is used to authenticate or identify handwriting." *Id.* at 447. Lay opinions can be omitted if it is "rationally based on the witness's perception," "helpful" to determining a factual issue, and not based on specialized knowledge. Fed. R. Evid. 701. "A nonexpert's opinion that handwriting is genuine" must be "based on familiarity with it that was not acquired for the current litigation." *Id.* 901(b)(2).

The familiarity requirement is longstanding. Since at least the early eighteenth century, lay witness testimony was admissible if the witness had knowledge of the author's writing. *See* Jennifer L. Mnookin, *Scripting Expertise: The History of Handwriting Identification Evidence and the Judicial Construction of Reliability* 87 Va. L. Rev. 1723, 1761 (2001). Animating the requirement is the observation that without prior familiarity, the lay witness will not provide any information that the factfinder itself could not glean from comparing genuine exemplars with the disputed writing. As the Second Circuit observed,

> A lay witness who lacks prior familiarity with a person's handwriting and forms an opinion on it for the first time in preparation for testimony as a witness does not offer helpful testimony. Not only does such a witness fail in bringing to bear some previously gathered familiarity with the handwriting, but the jury is equally capable of making the same comparisons.

*Harris*, 786 F.3d at 447 (quotation marks removed) (quoting *United States v. Samet*, 466 F.3d 251, 255 (2d Cir. 2006)). "Where a lay witness bases a handwriting opinion on exemplars reviewed for purposes of the litigation, the witness brings no more to that analysis than does the trier of fact." 31 Wright & Miller, *supra* § 7107 ("Even assuming the opinion satisfies Rule 701, it is admissible only if the witness' familiarity with the handwriting in question is 'not acquired for purposes of the litigation.' The provision reflects the drafter's judgment, embodied in Rule 901(b)[2], that only experts and the trier of fact itself should be permitted to draw conclusions from comparing the disputed item with genuine exemplars.").

Reflecting these insights, the Sixth Circuit has noted that "witness testimony is unhelpful when it addresses matters that are within the competence of the jury to understand and decide." *Harris*, 786 F.3d at 448. In contrast, "lay opinion testimony is 'helpful' within the meaning of Rule 701 when the witness has 'enjoyed significantly more time to study and compare the evidence' than the jury." *Id.* (quoting *United States v. Zepeda-Lopez*, 480 F. App'x 381, 387 (6th Cir. 2012)).

Assuming, for purposes of this Report, that Plaintiff can authenticate his exemplars, the only remaining evidentiary dispute centers on the lay opinions. While Plaintiff protests that all of the affiants "have been familiar with [his] handwriting over an extended period of time and not just with this litigation" (Doc. 70 at 734), only one of the affidavits expresses such familiarity. (Doc. 66, Ex. C at 704.) The rest simply state that they reviewed the exemplars he provided, which is exactly what the factfinder could do. If they have had no broader exposure to Plaintiff's writings, then they lack the necessary familiarity with the writings and they could not testify. *See Harris*, 786 F.3d at 448; Fed. R. Evid. 901(b)(2). Plaintiff's protest that they have such familiarty is a factual assertion which, because it comes from his brief, is not proper evidence. *See*

*Caruthers*, 2011 WL 6402278, at *2. Thus, as the evidence currently stands, only the notary public, Marylin Braxton, could testify at trial. There is no evidence that the other affiants meet the admissibility requirements; to the contrary, by noting only that they have reviewed his samples, the affiants strongly suggest that they have not been familiar with his writing over a longer period.

The admissible lay opinion, combined with the exemplars, does not raise a material issue of fact. The quitclaim deed appears regular and valid. It was signed by a Mississippi official, who stated that "the instrument was acknowledged before me," and stamped as recorded in Oakland County, Michigan. (Doc. 53, Ex. N at 516.) The deed contains all the information required in Michigan. *See* Mich. Comp. Laws § 55.287(2). The certificate of a notary public in this state provides "presumptive evidence of the facts contained in the certificate." Mich. Comp. Laws § 55.307(1).[9] Of course, this presumption can be overcome, but Plaintiff has not testified or even attested that the signature is not his; he merely disputes it in his brief, which as noted, does not constitute evidence.

Similarly, in Mississippi, where the deed was notarized, a properly acknowledged instrument "is presumed to be authentic because the certificate of acknowledgment imports verity and presumptively states the truth." *Thompson v. Shell Western E & P Inc.*, 607 So.2d 37, 40 (Miss. 1992). Only "a strong evidentiary showing" by clear and convincing evidence can overcome the presumption. *Id.* at 40-41. In one case involving an allegedly forged quitclaim deed, the court found enough evidence to overcome the presumption where the acknowledging official was the grantee's daughter, whose testimony contradicted her own prior statements. *Aron*

---

[9] Though this arguably constitutes an evidentiary rule where federal standards apply, courts have found that evidentiary presumptions are relevant to the underlying substantive claim and thus can be used in federal court. *See Jackson v. Allstate Ins. Co.*, 441 F. Supp. 2d 728, 734 n.9 (E.D. Penn. 2006) (incorporating the state substantive evidentiary burden to determine whether testimony that a writing was forged could create a genuine issue of material fact).

*v. Reid*, 850 So.2d 108, 113 (Miss. Ct. App. 2002). In another, copious amounts of testimony from both expert and lay friends served to rebut the presumption. *Thompson*, 607 So.2d at 41. Plaintiff here offers only exemplars and a lay opinion based largely on those exemplars. This is insufficient to cast doubt on the deed.

In any case, a party's "mere allegations of forgery in [a] complaint are insufficient to withstand summary judgment." *Jackson v. Allstate Ins. Co.*, 441 F. Supp. 2d 728, 734 n.9 (E.D. Penn. 2006) (applying Pennsylvania law but utilizing federal evidentiary standards). Thus Plaintiff's statements denying signing the document would not suffice, even if they were admissible by being properly sworn or declared. *See Asia North American Eastbound Rate Agreement v. Amsia Intern. Corp.*, 884 F. Supp. 5, 6 (D. D.C. 1995) ("However, because these statements [alleging forgery] are not sworn to under penalty of perjury, they cannot be considered affidavits or other admissible documentation proper for consideration at the summary judgment stage."). Plaintiff's statements therefore do not create a triable issue. Nor has he provided any direct evidence of the forgery, such as documents demonstrating he was not in Mississippi on the signature date or statements from witnesses who saw Defendants forge his name.

Plaintiff's attempts to raise an issue regarding Hayden Ables, who notarized the deed, are similarly unconvincing. He cites the results of research conducted by a librarian—likely inadmissible—who cannot find that "a notary public in Tishomingo, Ms. Ever existed." (Doc. 62 at 586.) Additionally, Mr. Ables is not on the current list of notary publics. (*Id.* at 586; *id.*, Ex. J at 615-17.) Yet Mr. Ables is not the myth Plaintiff makes him out to be. A 2003 Mississippi Supreme Court case references Mr. Ables's position as Chancery Clerk in Tishomingo County. *Mann v. Buford*, 853 So.2d 1217, 1218 (Miss. 2003). Chancery clerks, such as Mr. Ables was,

"are by statute ex-offico notaries public and are permitted to use the seal of their office to notarize documents." *McNeese v. McNeese*, 119 So.3d 264, 270 n.1 (Miss. 2013) (citing Miss. Code Ann. § 25-33-17, which was valid law in 1994 when Hayden Ables notarized the quitclaim deed). Thus there was a "Hayden Ables" armed with the notary power and serving the county where the deed was notarized around the same time it was notarized. The only evidence Plaintiff offers is a list of current notary publics, with the improbable inference that because Hayden Ables is not now a notary, he must not have been one twenty-one years ago either. This does not raise a material dispute worthy of trial.

In short, Plaintiff pits the writing exemplars—which would need authentication—and the lay opinion of an acquaintance against a facially valid notarized deed and Defendant Carol Walker's attestation. While Defendants, as the moving party, bear the initial burden, Plaintiff must produce evidence in response. And, moreover, he has the ultimate obligation of successfully proving his contentions. The meager evidence he offers could not justify a decision in his favor, and therefore no material issue of fact remains.

### F.      Plaintiff's Request for Additional Discovery Time

Though he has filed no formal motion, Plaintiff's requests for more time to complete discovery essentially constitute a request under Federal Rule of Civil Procedure 56(d). *See, e.g.*, (Doc. 61 at 574; Doc. 62 at 579.) That Rule allows the Court to deny or defer consideration of motions for summary judgment if the nonmovant "shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition." Fed. R. Civ. P. 56(d). In his briefs, Plaintiff has cited the recent death of his wife and the difficulties he experiences as a prisoner obtaining discovery materials. (Doc. 62 at 579; Doc. 65 at 654.) Regarding the latter argument, he implies that he can only make one request for legal materials per week—he does

not say how broad the request can be—and he can send legal mail only on Tuesdays. (Doc. 65 at 654.)

The Court cannot consider this a proper Rule 56(d) motion, even under liberal *pro se* standards, for doing so would dispense with the explicit requirement that the nonmovant support the request by affidavit or declaration,[10] which Plaintiff has not done. Even had he met these requirements, the request would still fail. The unfortunate death of his wife nearly one and a half years into this proceeding does not justify delaying summary judgment. The case began two years ago and concerns events roughly twenty years ago. Plaintiff had ample time to collect sworn statements from his wife and to seek other discoverable materials. Moreover, the new discovery plans Plaintiff sketches could not have all resulted from his wife's death. That is, he seeks materials containing details that he could not likely have obtained from his wife. For example, he asserts that he has written his former counsel asking for an affidavit describing the fate of the property the sheriff seized after Plaintiff's arrest. (Doc. 65 at 652.) As he elsewhere has stated that these events included a federal court order, it is unlikely that Plaintiff's wife could have produced the information Plaintiff hopes to collect from his old attorney. Finally, while the Court appreciates that conducting discovery from prison may pose difficulties, Plaintiff has had sufficient opportunity to assemble evidence. He presents no justification for further delaying the decision on summary judgment.

## IV.   Conclusion

Plaintiff has disputed nearly every contention Defendants have made to support their motion for summary judgment. What he has not done, however, is present evidence demonstrating that an issue of material fact remains in dispute. Without such evidence, he cannot

---

[10] Plaintiff's filings do not meet the statutory standard for unsworn declarations because he did not subscribe them under penalty of perjury. *See* 28 U.S.C. § 1746.

resist Defendants' motion. I therefore suggest that summary judgment in favor of Defendants is proper and that their motion (Doc. 53) should be granted.

## V.    <u>Review</u>

Rule 72(b)(2) of the Federal Rules of Civil Procedure states that "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2); see also 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. Thomas v. Arn, 474 U.S. 140, 155; Howard v. Sec'y of Health & Human Servs., 932 F.2d 505, 508 (6th Cir. 1991); United States v. Walters, 638 F.2d 947, 950 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. Willis v. Sec'y of Health & Human Servs., 931 F.2d 390, 401 (6th Cir. 1991); Smith v. Detroit Fed'n of Teachers Local 231, 829 F.2d 1370, 1373 (6th Cir. 1987). According to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

44

Date:  July 31, 2015                          S/ PATRICIA T. MORRIS
                                              Patricia T. Morris
                                              United States Magistrate Judge


### **CERTIFICATION**

    I hereby certify that the foregoing document was electronically filed this date through the Court's CM/ECF system which delivers a copy to all counsel of record.  A copy was also sent via First Class mail to Merlin Hill R4779 at East MS Correctional Facility, 10641 Hwy 80 West, Meridian, MS 39307.

Date: July 31, 2015                           By s/Kristen Krawczyk
                                              Case Manager to Magistrate Judge Morris